**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WILDEARTH GUARDIANS                )
301 N. Guadalupe Street, Ste. 201      )
Santa Fe, New Mexico 87501,            )
                                                         )
    and                                              )    Case No. 1:20-cv-00056
                                                         )
PHYSICIANS FOR SOCIAL RESPONSIBILITY )
1111 14th St. N.W., Ste. 700               )
Washington, D.C. 20005,                    )
                                                         )
        Plaintiffs,                             )
                                                         )
    v.                                                   )
                                                         )
DAVID BERNHARDT, Secretary,            )
U.S. Department of the Interior           )
1849 C Street N.W.                            )
Washington, D.C. 20240,                    )
                                                         )
WILLIAM PERRY PENDLEY, Acting Director, )
U.S. Bureau of Land Management        )
1849 C Street N.W.                            )
Washington, D.C. 20240, and              )
                                                         )
U.S. BUREAU OF LAND MANAGEMENT )
1849 C Street N.W.                            )
Washington, D.C. 20240,                    )
                                                         )
        Defendants.                          )

---

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**

1.      Through this lawsuit, Plaintiffs WildEarth Guardians and Physicians for Social

Responsibility (collectively "Citizen Groups") challenge Federal Defendants' approval of 2,067

oil and gas leases encompassing almost two million acres of public lands across five western

states—Colorado, Montana, New Mexico, Utah, and Wyoming. BLM approved the leases at

issue without fully analyzing the direct, indirect, and cumulative impacts of oil and gas leasing on our climate in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and its implementing regulations, 40 C.F.R §§ 1500.1–1518.4.

2.      Global climate change is the greatest threat that humanity has ever faced. The scientific consensus is clear: as a result of greenhouse gas ("GHG") emissions, the global climate is rapidly destabilizing with catastrophic results. Rising seas, more extreme heatwaves, increased drought and flooding, larger and more devastating wildfires and hurricanes, and other terrifying changes are now upon us, the deadly consequence of the fossil fuel industry's reckless interference with the stability of the global climate. GHG emissions from the production and combustion of fossil fuels, such as coal, oil, and gas, are the predominant drivers of climate change.

3.      Federal public lands used for fossil fuel extraction contribute 24% of the United States' GHG emissions. If federal lands were their own country, their GHG emissions would be ranked fifth globally. Moreover, future development of unleased federal minerals represents a "carbon bomb" that would likely push global climate change to catastrophic levels with incalculable consequences for the American people, the rest of humanity, and the global environment. Yet, Federal Defendants have failed to seriously consider the cumulative climate impacts of opening up vast swaths of public lands for fossil fuel production, as exemplified by their approval of thousands of new oil and gas leases covering millions of acres of public lands in the West without a full analysis as required under NEPA.

4.      The Bureau of Land Management ("BLM"),[1] a federal agency under the Department of Interior, manages the majority—nearly 700 million acres—of public minerals.

---

[1] Throughout the Complaint, Federal Defendants are collectively referred to as BLM.

About half of this federal mineral estate contains oil and/or natural gas, and over 25 million acres of federally-managed lands are currently leased to private companies for oil and gas. The BLM's onshore Oil and Gas Leasing Program contributes vast amounts of GHG pollution to the atmosphere.

5.      While the Obama Administration instituted various policies to address climate impacts from federal lands, the Trump Administration has instead embraced an "energy dominance" agenda and attempted to reverse many of these policies. Many of these attempts have been struck down in court. Ultimately, the law is clear—NEPA requires the federal government to not only *quantify* direct, indirect, and cumulative GHG emissions from federal actions, but also *analyze* the impacts of these emissions on our climate.

6.      BLM, however, continues to recklessly lease large swaths of the American West to oil and gas development without comprehensively estimating the cumulative GHG emissions from this development and analyzing the severity of resulting climate impacts from the addition of thousands of tons of GHG emissions into the atmosphere, as NEPA requires. At issue here are 23 BLM oil and gas lease sales across five Western states—Colorado, Montana, New Mexico, Utah, and Wyoming—where the agency failed to comply with NEPA by refusing to analyze GHG emissions and climate impacts. The map on the following page shows the distribution of the challenged lease authorizations across the American West. A list of BLM's leasing decisions challenged herein is provided in Table A at the end of the Complaint.



7.    In each of these lease sales, BLM: (1) failed to properly quantify direct greenhouse emissions from the lease parcels and analyze the climate impacts of these direct emissions; (2) failed to properly quantify indirect (downstream) greenhouse emissions and analyze the climate impacts of these indirect emissions; and/or (3) failed to properly quantify cumulative greenhouse emissions and analyze the cumulative climate impacts in conjunction with past, present, and reasonably foreseeable oil and gas development within the American West region as well as BLM's national oil and gas leasing program.

8.    BLM's process for approving the lease authorizations challenged herein is a prime example of the fundamental disconnect between the ongoing climate crisis and the federal

4

oil and gas leasing program. BLM shows no signs of acknowledging or addressing this disconnect. Instead, BLM continues its ongoing pattern of unlawfully authorizing and issuing leases—without taking a hard look at the impacts of rampant oil and gas development and subsequent combustion to our climate.

9.      On March 19, 2019, this Court rejected BLM's excuses for failing to fully consider the climate impacts of oil and gas development, and forced the agency to suspend nine oil and gas leasing decisions authorizing issuance of 282 leases until BLM completed an analysis that complied with NEPA. In *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019), the Court held that BLM violated NEPA when it failed to fully analyze all reasonably foreseeable GHG emissions and climate change impacts of its oil and gas leasing decisions in Wyoming. Among other things, the Court found that BLM failed to (1) quantify GHG emissions from oil and gas leasing and development, and (2) analyze GHG emissions from all past, present, and reasonably foreseeable oil and gas leasing decisions from public lands on a regional and national scale. *See id.* at 67-78.

10.     *WildEarth Guardians v. Zinke* has broad ramifications for BLM's oil and gas leasing program. In response to the decision, BLM further recognized the deficiency of its NEPA analyses regarding GHG emissions and climate change impacts for similar oil and gas leasing decisions in Utah and Colorado, and agreed to a voluntary remand of those decisions. However, BLM has not recognized or sought to remedy similarly unlawful NEPA analyses supporting the 23 leasing authorizations challenged herein, which fail to consider direct, indirect and cumulative GHG emissions and climate impacts in accordance with *WildEarth Guardians v. Zinke*.

11.     As a result, Citizen Groups hereby bring this civil action for declaratory and injunctive relief against BLM, challenging as arbitrary federal leasing authorizations

encompassed in 23 separate lease sales across five western states in violation of NEPA and its implementing regulations.

## JURISDICTION & VENUE

12.    This action arises under NEPA, 42 U.S.C. §§ 4321–4370h, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

13.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because the action raises a federal question. The Court has authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

14.    This action reflects an actual, present, and justiciable controversy between Citizen Groups and BLM within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201. Citizen Groups' interests will be adversely affected and irreparably injured if BLM continues to violate NEPA as alleged herein, and if it affirmatively implements the decisions challenged herein. These injuries are concrete and particularized and fairly traceable to BLM's challenged decisions, providing the requisite personal stake in the outcome of this controversy necessary for this Court's jurisdiction.

15.    The requested relief would redress the actual, concrete injuries to Citizen Groups caused by BLM's failure to comply with duties mandated by NEPA and its implementing regulations.

16.    The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, 706.

17.    Citizen Groups have exhausted any and all available and requested administrative remedies.

18.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because all Federal Defendants and one of the Plaintiffs, Physicians for Social Responsibility, reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made here by Federal Defendants. The underlying decisionmaking and guidance, with respect to BLM's Oil and Gas Leasing Program as disseminated to the agency's field offices, have occurred in this district due to decisions made by Federal Defendants.

**PARTIES**

19.     PLAINTIFF WILDEARTH GUARDIANS ("Guardians") is a non-profit membership organization based in Santa Fe, New Mexico, with offices throughout the Western United States, including in Denver, Colorado; Boise, Idaho; Missoula, Montana; Portland, Oregon; Seattle, Washington; and Tucson, Arizona. Guardians has over 275,000 members and supporting activists, many of whom live, work, and/or recreate on and near the public lands and minerals that are the subject of this Complaint. Guardians' mission is to protect and restore the wildlife, wild places, wild rivers, and health of the American West. To fulfill this mission, Guardians and its members work to confront the harmful impacts of fossil fuel production and consumption and to advance a transition to clean, renewable energy in order to safeguard public health, the environment, and the climate.

20.     Plaintiff PHYSICIANS FOR SOCIAL RESPONSIBILITY ("PSR") is a nonprofit organization based in Washington, D.C., with chapters across the country and over 30,000 members and activists. PSR works with health professionals and other advocates to protect human life from the gravest threats to health and survival — in particular, the development and

use of nuclear weapons and the catastrophic consequences of climate change and other environmental damage.

21.    Citizen Groups' members and supporters regularly use and enjoy the cultural resources, wildlands, wildlife habitat, rivers, streams, and healthy ecosystems on and adjacent to the federal public lands where the challenged leases are located in Colorado, Montana, New Mexico, Utah, and Wyoming. Specifically, Citizen Groups' members and supporters use the lands and areas affected by BLM's lease authorizations for camping, fishing, hiking, hunting, photographing scenery and wildlife, wildlife viewing, aesthetic enjoyment, and engaging in other vocational, scientific, and recreational activities. Citizen Groups' members derive recreational, inspirational, scientific, educational, and aesthetic benefit from their activities on lands within the leasing authorizations challenged herein, and on lands that are around or within view of lands affected by the leasing authorizations challenged herein.  Some examples of Citizens' Groups members deriving enjoyment from public lands affected by the challenged leasing authorizations include, but are not limited to:

    a.  Citizen Groups' members frequently recreate on public lands throughout Colorado that are impacted by the challenged oil and gas leases.  Members frequently recreate on public lands in the Pawnee National Grassland, in and near the Arapaho National Wildlife Refuge, and on public lands adjacent to the White River near the town of Rangely, all areas where challenged oil and gas leases are located. In these areas and other parts of Colorado, members have both viewed areas that will be impacted by development of the leases and directly set foot on many of the challenged oil and gas leases.

b.  Citizen Groups' members frequently recreate on public lands throughout Montana that are impacted by the challenged oil and gas leases. Members frequently recreate on public lands along the Teton River near the town of Fort Benton, in the Tongue River Valley in southeastern Montana, in the Beaverhead River Valley near the town of Dillon, east and southeast of Miles City, and east of Glacier National Park, all areas where challenged oil and gas leases are located. In these areas and in other parts of Montana, members have both viewed areas that will be impacted by development of the leases and directly set foot on many of the challenged oil and gas leases.

c.  Citizen Groups' members frequently recreate on public lands throughout New Mexico that are impacted by the challenged oil and gas leases. Members frequently recreate on public lands east of the Guadalupe Mountains, east of Carlsbad Caverns National Park, and southeast of the town of Roswell, all areas where challenged oil and gas leases are located. In these areas and in other parts of New Mexico, members have both viewed areas that will be impacted by development of the leases and directly set foot on many of the challenged oil and gas leases.

d.  Citizen Groups' members frequently recreate on public lands throughout Utah that are impacted by the challenged oil and gas leases. Members frequently recreate on public lands in the Fishlake National Forest east of the town of Richfield and along the East Fork of the Sevier River in northern Garfield and southern Piute Counties, all areas where challenged oil and gas leases are located. In these areas and in other parts of Utah, members have both viewed areas that

will be impacted by development of the leases and directly set foot on many of the challenged oil and gas leases.

e.    Citizen Groups' members frequently recreate on public lands throughout Wyoming that are impacted by the challenged oil and gas leases. Members frequently recreate on public lands in and around the Adobe Town Wilderness Study Area in southern Wyoming, in and around the Honeycomb Buttes, Oregon Buttes, and Whitehorse Creek Wilderness Study areas in central Wyoming, west of the town of Casper, in and around the Fortification Creek Wilderness Study Area in northeast Wyoming, in and around the Thunder Basin National Grassland south of the town of Gillette, in and around the Great Divide Basin in south-central Wyoming, and in the Upper Green River Basin south of the town of Pinedale, all areas where challenged oil and gas leases are located. In these areas and in other parts of Wyoming, members have both viewed areas that will be impacted by development of the leases and directly set foot on many of the challenged oil and gas leases.

22.    Citizen Groups' members and supporters intend to continue to use and enjoy the lands affected by the challenged leasing authorizations. Citizen Groups' members and supporters also intend to continue to use and enjoy lands that are around or within view of lands affected by the leasing authorizations challenged herein, as well as federal public lands impacted by subsequent lease development. Citizen Groups' members and supporters intend to use these lands to enjoy cultural resources, wildlands, wildlife habitat, rivers, streams, and healthy environments frequently and on an ongoing basis long into the future, including in 2020 and in subsequent years.

23.     Citizen Groups' members' enjoyment of public lands in and adjacent to the leases challenged herein will be adversely affected and diminished as a result of BLM's leasing actions. Citizen Groups' members have not only recreated on public lands that include the lease sale parcels that are the subject of this lawsuit, but they also enjoy public lands adjacent to these parcels. The reasonably foreseeable development of these lease parcels will industrialize these treasured landscapes, produce visible air pollution that is offensive and threatening to health and safety, create noise that disrupts wildlife and recreational enjoyment, and lead to connected development that will further adversely impact nearby public lands, including road construction, truck traffic, and the construction of oil and gas pipelines and processing facilities needed to sustain the production of oil and gas on the lease parcels that are the subject of this lawsuit.

24.     Citizen Groups and their members have a procedural interest in BLM's full compliance with NEPA's planning and decisionmaking processes when authorizing oil and gas development on public lands in the American West and in and around the lease sale areas in particular, as well as BLM's attendant duty to substantiate its decisions in the record for these authorizations.

25.     A favorable ruling in this case would redress the harms that Citizen Groups' members and supporters stand to suffer as a result of BLM's actions. If BLM follows NEPA's procedural and substantive requirements and properly considered the climate impacts of its actions, it may reach a different decision and not offer many of the leases for sale and issuance. This would reduce and/or eliminate the threat of reasonably foreseeable oil and gas development, preventing the diminishment of the enjoyment of public lands used by Citizen Groups' members. A favorable ruling would reduce or eliminate harm to the Citizen Groups' members. At the very least, a favorable ruling may delay development of oil and gas infrastructure on the leased

parcels until BLM has taken a hard look and fully disclosed the direct, indirect, and cumulative climate impacts of its oil and gas leasing decisions, as required by law.

26.     Defendant DAVID BERNHARDT, sued in his official capacity as the Secretary of the U.S. Department of the Interior, is responsible for managing the public lands and resources in the American West—including Colorado, Montana, New Mexico, Utah, and Wyoming—and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

27.     Defendant WILLIAM PERRY PENDLEY, Acting Director of the Bureau of Land Management, an agency within the United States Department of the Interior, is responsible for managing the public lands, resources, and public mineral estate of the United States, including lands and resources in Colorado, Montana, New Mexico, Utah, and Wyoming. In his official capacity, Acting Director Pendley is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

28.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT, an agency within the United States Department of the Interior, is responsible for managing public lands and resources in Colorado, Montana, New Mexico, Utah, and Wyoming, including federal onshore oil and gas resources and the leasing program for those resources. In this managerial capacity, BLM is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

## LEGAL BACKGROUND

### I.     National Environmental Policy Act

29.     NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1. Through NEPA, Congress recognized that "each person should enjoy a

healthful environment"—and that the federal government will by all practicable means "assure

for all Americans safe, healthful, productive, and esthetically and culturally pleasing

surroundings," and "attain the widest range of beneficial uses of the environment without

degradation, risk to health or safety, or other undesirable and unintended consequences," among

other policies. 42 U.S.C. § 4331(b). One critical goal of NEPA was to put consideration of

environmental impacts on equal footing with consideration of economic impacts. Thus, NEPA

requires agencies to "develop methods and procedures … which will insure that presently

unquantified environmental amenities and values may be given appropriate consideration in

decisionmaking along with economic and technical considerations." *Id.* § 4332(2)(B).

30.    NEPA regulations in 40 C.F.R. §1500.1(c) explain that:

> Ultimately, of course, it is not better documents but better decisions that
> count. NEPA's purpose is not to generate paperwork – even excellent
> paperwork – but to foster excellent action. The NEPA process is intended
> to help public officials make decisions that are based on understanding of
> environmental consequences, and take actions that protect, restore, and
> enhance the environment.

31.    NEPA achieves its purpose through "action forcing procedures . . . requir[ing]

that agencies take a *hard look* at environmental consequences." *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 350 (1989) (internal citations omitted) (emphasis added).

32.    "Agencies shall integrate the NEPA process with other planning at the earliest

possible time to insure that planning and decisions reflect environmental values, to avoid delays

later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.

33.    Federal agencies must comply with NEPA before there are "any irreversible and

irretrievable commitments of resources which would be involved in the proposed action should it

be implemented." 42 U.S.C. § 4332(2)(C)(v). For oil and gas, "the leasing stage is the point of

no return with respect to GHG emissions." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 66.

Thus, BLM is required to fully analyze the reasonably foreseeably impacts of GHG emissions at the leasing stage. *Id.*

34. To accomplish this purpose, NEPA requires federal agencies to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, indirect, and cumulative environmental effects, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16. The scope of the analysis must include "[c]umulative actions," or actions that "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same statement," and "[s]imilar actions," or actions that "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together." 40 C.F.R. § 1508.25(a)(2), (3).

35. Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. "Effects" are synonymous with "impacts." *Id.* § 1508.8.

36. These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. § 1508.8.

37.    BLM's analysis must do more than merely identify impacts; it must also "evaluate the severity" of effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); 40 C.F.R. § 1502.16(a)–(b) (recognizing that agency must explain the "significance" of effects).

38.    An agency may also prepare an environmental assessment ("EA") to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

39.    If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI"). *Id.* § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13. An assessment of whether or not an impact is "significant" is based on a consideration of the "context and intensity" of the impact. *Id.* § 1508.27. "Context" refers to the scope of the proposed action, including the interests affected. *Id.* § 1508.27(a). "Intensity" refers to the severity of the impact and must be evaluated with a host of factors in mind, including but not limited to [u]nique characteristics of the geographic area[,]" "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks[,]" and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.* § 1508.27(b).

40.    NEPA allows an agency to "tier" a site-specific environmental analysis for a project to a broader EIS for a program or plan under which the subsequent project is carried out. *Id.* § 1508.28. When an agency tiers a site-specific analysis to a broader EIS, "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." *Id.* § 1502.20.

41.     As a general rule, tiering a site-specific EA to another NEPA document is only appropriate where "the conditions and environmental effects described in the broader NEPA document are still valid" or the site-specific EA addresses any exceptions. 43 C.F.R. § 46.140. If the programmatic EIS sufficiently analyzes the impacts of the site-specific action, the agency is not required to perform additional analysis of impacts. *Id*. § 46.140(a). However, if the impacts analysis in the programmatic EIS "is not sufficiently comprehensive or adequate to support further decisions," the agency's EA must explain this and provide additional analysis. *Id* § 46.140(b).

42.     In some cases, BLM may prepare a Determination of NEPA Adequacy ("DNA") to assess whether existing documents demonstrate compliance with NEPA. DNAs are not NEPA documents themselves and can only be used to determine the sufficiency of previously issued NEPA documents.

## II.     The Administrative Procedure Act

43.     The Administrative Procedure Act ("APA") provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.* § 704.

44.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). A court must also compel agency action unlawfully withheld or unreasonably delayed. *Id.* § 706(1).

### III.    Legal Framework for Federal Oil and Gas Lease Authorizations

#### A.    Mineral Leasing Act

45.    Under the Mineral Leasing Act of 1920 ("MLA"), as amended, the Secretary of the Interior is responsible for managing and overseeing mineral development on public lands, not only to ensure safe and fair development of the mineral resource, but also to "safeguard[] . . . the public welfare." 30 U.S.C. § 187.

46.    The Secretary has certain discretion, constrained by the laws at issue in this case, to determine where, when, and under what terms and conditions mineral development should occur. 43 C.F.R. § 3101.1-2. The grant of rights in a federal mineral lease is subject to a number of reservations of authority to the federal government, including reasonable measures concerning the timing, pace, and scale of development. *Id.*

47.    Not all of the parcels offered for sale in any given BLM lease sale are awarded through competitive bidding. For example, in 2018, BLM reported that of the 3,073 lease sale parcels offered for sale, only 1,336 received bids. Parcels offered but not sold at auction are made available for private sale for two years after the competitive lease sale. 30 U.S.C. § 226(b)(1)(A).

48.    BLM's MLA regulations also state that "[t]he authorized officer may suspend the offering of a specific parcel while considering a protest or appeal against its inclusion in a Notice of Competitive Lease Sale." *Id.* § 3120.1-3.

#### B.    BLM's Oil and Gas Planning and Management

49.    BLM manages onshore oil and gas development through a three-phase process. Each phase is distinct, serves distinct purposes, and is subject to distinct rules, policies, and procedures.

50.     In the first phase, BLM prepares a Resource Management Plan ("RMP") in accordance with 43 C.F.R. §§ 1600 *et seq.*, and BLM's Land Use Planning Handbook (H-1601-1). An RMP projects present and future uses of public lands and resources by establishing management priorities, as well as guiding and constraining BLM's implementation-stage management. With respect to fluid mineral leasing decisions, BLM generally determines which federal minerals will be open to leasing and under what conditions. BLM's determinations are to be based on a hard look analysis of the direct, indirect, and cumulative impacts to the human environment of predicted implementation-stage development in the RMP's corresponding EIS.

51.     Along with the RMP, BLM generally develops a reasonably foreseeable development scenario ("RFDS") outlining the projected pace and scope of oil and gas development within the RMP planning area. An RFDS does not include any analysis of environmental impacts and is not a NEPA document.

52.     In the second phase, oil and gas companies typically nominate leaseholds for sale through the submission of an "Expression of Interest." *See* 43 C.F.R. § 3120.1-1 (providing that "lands included in any expression of interest … shall be offered for competitive bidding"). BLM then assesses whether these lands are available, identifies the boundaries for lands to be offered for lease, and proceeds to offer up those lands through a lease sale. Leases are sold in accordance with 43 C.F.R. §§ 3120 *et seq.*, and agency guidance, including BLM Instruction Memorandum ("IM") 2010-117, which applies to all oil and gas leases issued between May 17, 2011 and January 29, 2018, and BLM IM No. 2018-034,[2] which applies to all oil and gas leases issued

---

[2] On September 21, 2018, the U.S. District Court for the District of Idaho enjoined BLM IM 2018-034. *Western Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1238 (D. Idaho 2018). The court held that the IM violated NEPA and the Federal Land Policy and Management Act ("FLPMA") because it "limit[ed] the opportunity for (and even in some circumstances preclude[d] entirely) any contemporaneous public involvement in decisions concerning whether

between January 30, 2018 to current day. The BLM state office generally oversees the lease sale, while the BLM field office where the specific lease parcels are located conducts NEPA review, solicits public comment, and applies appropriate site-specific leasing stipulations.

53.    BLM regulations allow for the public to protest the sale of specific parcels. 43 C.F.R. § 3120.1-3. Although BLM may proceed with a lease sale after a protest has been filed, BLM must resolve any and all protests received prior to issuing a lease parcel to a successful bidder. BLM Competitive Leases Handbook H-3120-1, Section II.G. ("Every effort must be made to decide the protest prior to the sale."); IM 2018-034 ("State offices should attempt to resolve protests in a signed decision before the sale of the protested parcels.").

54.    NEPA regulations mandate that agencies "shall to the fullest extent possible . . . [e]ncourage and facilitate public involvement in the decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2(d). BLM regulations also require public participation during oil and gas lease sales. *See* 40 C.F.R. § 3120.1-3 (requiring a protest period), § 3120.4-1 (requiring notice of a competitive lease sale).

55.    BLM is also required to take a hard look at the impacts from the lease sale before parcels are sold. "A hard look requires that BLM assess the 'reasonably foreseeable' impacts of a proposed action before an 'irretrievable commitment[ ] of resources' is made that would trigger those impacts." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 64 (citing 42 U.S.C. § 4331(2)(C)(v), *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999)). "[T]he leasing stage is the point of no return with respect to GHG emissions." *Id.* at 66.

56.    Prior to the point BLM sells a lease, BLM may refuse to lease public lands, even if public lands were made available for leasing pursuant to the RMP. *Udall v. Tallman*, 380 U.S.

---

to grant oil and gas leases on federal lands." The decision occurred in the context of oil and gas leases in sage grouse habitat.

1, 4 (1965).

57.    Prior to a BLM lease sale, BLM has the authority to subject leases to terms and conditions, which can serve as "stipulations" to protect the environment. 43 C.F.R. § 3101.1-3. Once BLM issues leases, it may only impose conditions of approval ("COAs") that are delimited by the terms and conditions of the lease. *Id.* § 3101.1-2.

58.    Once sold, the lease purchaser has the right to use as much of the leased land as is necessary to explore and drill oil and gas within the lease boundaries, subject to stipulations attached to the lease. *Id.*

59.    The Secretary of the Interior has the authority to cancel leases that have been "improperly issued." 43 C.F.R. § 3108.3(d). A lease may be canceled where BLM has not complied with NEPA prior to lease issuance. *Clayton W. Williams, Jr.*, 103 IBLA 192 (1988).

60.    The third-phase occurs once BLM issues a lease. In order to develop the minerals, the lessee is required to submit an application for permit to drill ("APD") to BLM. 43 C.F.R. § 3162.3-1(c). At this stage, BLM may condition the approval of the APD on the lessees' adoption of "reasonable measures" whose scope is delimited by the lease and the lessees' surface use rights. *Id.* § 3101.1-2.

61.    Oil and gas operations must be conducted in accordance with BLM regulations at 43 C.F.R. §§ 3160 *et seq*.

## FACTUAL BACKGROUND

### I.    The Climate Crisis

62.    The scientific consensus is clear: as a result of GHG emissions, our climate is rapidly destabilizing with potentially catastrophic results, including rising seas, more extreme heatwaves, increased drought and flooding, larger and more devastating wildfires and hurricanes,

and other destructive changes. It is now conclusively-established that GHG emissions—in particular carbon dioxide and methane—from the production and combustion of fossil fuels, such as coal, oil, and gas, are the predominant drivers of climate change.

63.    Carbon dioxide ("$CO_2$") is the leading cause of climate change and the largest source of GHG emissions in the United States. According to a 2019 EPA report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2017*,[3] carbon dioxide comprised 82 percent of total U.S. GHG emissions, or 5,270.7 million metric tons. EPA's data indicates that fossil fuel combustion accounted for 93.2 percent of $CO_2$ emissions in 2017.

64.    Methane is an extremely potent GHG, with a global warming potential 86 times than $CO_2$ over a 20-year period. Over a 100-year period, methane has a climate impact 28 to 36 times greater than $CO_2$ on a ton-for-ton basis. Large amounts of methane are released during the extraction, processing, transportation, and delivery of oil and gas, with significant climate impacts.

65.    The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change. In its 2014 assessment report on climate change,[4] the IPCC provided a summary of our understanding of human-caused climate change:

- Human influence on the climate system is clear, and recent anthropogenic emissions of [GHGs] gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems.

---

[3] Available online at: https://www.epa.gov/sites/production/files/2019-04/documents/us-ghg-inventory-2019-main-text.pdf.
[4] IPCC, Climate Change 2014 Synthesis Report, Summary for Policymakers, available at http://www.ipcc.ch/pdf/assessment-report/ar5/syr/AR5_SYR_FINAL_SPM.pdf.

- Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.

- Anthropogenic [GHGs] greenhouse gas emissions have increased since the pre-industrial era, driven largely by economic and population growth, and are now higher than ever. This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years. Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been the dominant cause of the observed warming since the mid-20[th] century.

- In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans. Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.

- Continued emission of [GHGs] will cause further warming and long-lasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in [GHG] emissions which, together with adaptation, can limit climate change risks.

- Surface temperature is projected to rise over the 21st century under all assessed emission scenarios. It is very likely that heat waves will occur more often and last longer, and that extreme precipitation events will become more intense and frequent in many regions. The ocean will continue to warm and acidify, and global mean sea level to rise.

66.    The IPCC recently issued a special report[5] in October 2018 that examined, in

more depth, the impacts of global warming of 1.5°C above pre-industrial levels as compared to

2.0°C. The IPCC's findings included:

- Climate models project robust differences in regional climate characteristics between present-day and global warming of 1.5°C, and between 1.5°C and 2°C. These differences include increases in: mean temperature in most land and ocean regions (high confidence), hot extremes in most inhabited regions (high confidence), heavy precipitation in several regions (medium confidence), and the probability of drought and precipitation deficits in some regions (medium confidence).

---

[5] IPCC Special Report, Global Warming of 1.5°: Summary for Policy Makers (2018), http://report.ipcc.ch/sr15/pdf/sr15_spm_final.pdf.

- By 2100, global mean sea level rise is projected to be around 0.1 metre lower with global warming of 1.5°C compared to 2°C (medium confidence).

- On land, impacts on biodiversity and ecosystems, including species loss and extinction, are projected to be lower at 1.5°C of global warming compared to 2°C. Of 105,000 species studied, 6% of insects, 8% of plants and 4% of vertebrates are projected to lose over half of their climatically determined geographic range for global warming of 1.5°C, compared with 18% of insects, 16% of plants and 8% of vertebrates for global warming of 2°C (medium confidence).

- For oceans, coral reefs are project to decline by a further 70–90% at 1.5°C (high confidence) with larger losses (>99%) at 2°C (high confidence).

- Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5°C and increase further with 2°C. Limiting warming to 1.5°C could reduce the number of people both exposed to climate-related risks and susceptible to poverty by up to several hundred million by 2050 (medium confidence).

- Pathways limiting global warming to 1.5°C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (high confidence). These systems transitions are unprecedented in terms of scale, but not necessarily in terms of speed, and imply deep emissions reductions in all sectors, a wide portfolio of mitigation options and a significant upscaling of investments in those options (medium confidence).

- Estimates of the global emissions outcome of current nationally stated mitigation ambitions as submitted under the Paris Agreement would lead to global [GHG] gas emissions in 2030 of 52–58 GtCO2eq yr−1 (medium confidence). Pathways reflecting these ambitions would not limit global warming to 1.5°C, even if supplemented by very challenging increases in the scale and ambition of emissions reductions after 2030 (high confidence). Avoiding overshoot and reliance on future large-scale deployment of carbon dioxide removal (CDR) can only be achieved if global CO2 emissions start to decline well before 2030 (high confidence).

67.     The western United States is particularly susceptible to the effects of climate change. The West is experiencing increasing temperatures and prolonged droughts. The impacts of these changes are widespread across our forests, wildlife, and human communities, threatening the West's resilience in the face of continued warming. These impacts also have

significant importance to local economies that are reliant on consistent precipitation and snowfall for surface and groundwater recharge, agriculture, recreation, and other uses.

68.    According to the Fourth National Climate Assessment,[6] released in 2018, temperatures have already "increased across almost all of the Southwest region[7] from 1901 to 2016," magnifying the impacts of drought and wildfire. For example, hotter temperatures have already contributed to reductions in snowpack, amplifying drought conditions in the Colorado River Basin, the Rio Grande, and other critical watersheds. It is also estimated that the area burned by wildfire across the western United States between 1984 and 2015 was twice what would have burned had climate change not occurred.

69.    Future projections for the West are even more alarming. In the Southwest, climate changes threatens to lead to "to aridification (a potentially permanent change to a drier environment) . . . through increased evapotranspiration, lower soil moisture, reduced snow cover, earlier and slower snowmelt, and changes in the timing and efficiency of snowmelt and runoff." Climate change-related drought has already had massive impacts on food production and the agricultural economy of rural areas in the Southwest, and poses a long-term threat to food security in the region.

70.    For the Northern Great Plains, which includes Montana and Wyoming, the Fourth National Climate Assessment found "[t]he highly variable climate of the Northern Great Plains poses challenges for the sustainable use of water, land, and energy resources by competing urban, suburban, rural, and tribal populations." Climate change is expected "to exacerbate those challenges, which include 1) effectively managing both overabundant and scarce water

---

[6] Reidmiller *et al.*, USGCRP, Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II (2018), https://nca2018.globalchange.gov/.
[7] The Southwest region includes Colorado, New Mexico, and Utah.

resources, 2) supporting adaptation of sustainable agricultural systems, 3) fostering conservation

of ecosystems and cultural and recreational amenities, 4) minimizing risk to energy infrastructure

that is vulnerable to climate change and extreme weather events, and 5) mitigating climate

impacts to vulnerable populations."

## II.     Federal Climate Policy

71.     In 2001, at the start of the George W. Bush Administration, the Secretary of the

Interior established Interior policy that "[t]here is a consensus in the international community

that global climate change is occurring and that it should be addressed in governmental decision

making." Secretarial Order 3226, *Evaluating Climate Change Impacts in Management Planning*

(January 19, 2001). Secretarial Order 3226 established the responsibility of Interior agencies,

such as BLM, to "consider and analyze potential climate change impacts when undertaking long-

range planning exercises, when setting priorities for scientific research and investigations, when

developing multi-year management plans, and/or when making major decisions regarding

potential utilization of resources under the Department's purview."

72.     In a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for

Addressing the Effects on Federal Land and Water Resources,* the U.S. Governmental

Accountability Office ("GAO"), concluded that the Department of the Interior had not provided

specific guidance to implement Secretarial Order 3226, that officials were not even aware of

Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored.

73.     Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's

Water, Land, and Other Natural and Cultural Resources* (September 14, 2009), reinstated the

provisions of Order 3226, and recognized that "the realities of climate change require us to

change how we manage the land, water, fish and wildlife, and cultural heritage and tribal lands

and resources we oversee," and acknowledged that Interior is "responsible for helping protect the nation from the impacts of climate change."

74.    In Executive Order No. 13514, *Federal Leadership in Environmental, Energy, and Economic Performance* (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their GHG emissions from direct and indirect activities." 74 Fed. Reg. 52,117 (Oct. 8, 2009) (revoked by Executive Order No. 13693, revoked by Executive Order No. 13834). This directive was followed up by Executive Order No. 13693, *Planning for Federal Sustainability in the Next Decade* (March 25, 2015), which reaffirmed the federal government's commitment to reducing GHG emissions. 80 Fed. Reg. 15,871 (March 25, 2015).

75.    In 2009, the Environmental Protection Agency ("EPA") issued a formal finding under the Clean Air Act, 42 U.S.C. § 7521(a), that the changes in our climate caused by elevated concentrations of GHGs in the atmosphere are reasonably anticipated to endanger the public health and welfare of current and future generations. 74 Fed. Reg. 66,496 (Dec. 15, 2009). EPA concluded that "the body of scientific evidence compellingly supports" the finding and recognized the potential human-induced climate change to have "far-reaching and multidimensional" impacts. *Id*. at 66,497. In 2015, EPA acknowledged more recent scientific assessments that "highlight the urgency of addressing the rising concentrations of $CO_2$ in the atmosphere." 80 Fed. Reg. 64,661 (Oct. 23, 2015). The D.C. Circuit upheld this decision as supported by the vast body of scientific evidence on the subject. *See Coal. for Responsible Regulation, Inc. v. EPA.*, 684 F.3d 102, 120-22 (D.C. Cir. 2012).

76.    The White House Council on Environmental Quality ("CEQ") has also recognized the unique nature of climate change and the challenges it imposes on NEPA compliance. On August 1, 2016, the CEQ released its *Final Guidance for Federal Departments*

*and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews* (hereafter, "2016 Climate Guidance") (withdrawn on April 5, 2017, 82 Fed. Reg. 16,576 (Apr. 5, 2017)). Applicable to all proposed federal agency actions, "including land and resource management actions," *id*. at 9, the 2016 Climate Guidance recognized that:

> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. *Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA.* Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact.

*Id.* at 10-11 (emphasis added).

77.    The 2016 Climate Guidance also stated that "[i]n the context of long-range energy, transportation, and resource management strategies . . . it would be useful and efficient to provide an aggregate analysis of GHG emissions or climate change effects in a programmatic analysis and then incorporate by reference that analysis into future NEPA reviews." In particular, CEQ identified "issuing leases for oil and gas drilling" as a "site-specific action[] that may benefit from being able to tier to a programmatic NEPA review."

78.    Just as the Trump Administration's denial of the climate crisis does not alter scientific reality, its withdrawal of the 2016 CEQ Climate Guidance and other climate policies does not alter BLM's obligation under NEPA to take a hard look and fully assess the significance

of the climate impacts of its oil and gas leasing decisions. In failing to make such an assessment, BLM has refused to avail itself to readily-available, scientifically-accepted tools for evaluating the significance of GHG emissions.

### A.    The Social Cost of Carbon

79.    In recognition of the consequences of human-caused climate change, federal agencies have developed a protocol for assessing the social cost of carbon dioxide emissions. The social cost of carbon is "an estimate of the monetized damages associated with an incremental increase in carbon emissions in a given year."[8] Conversely, the social cost of carbon can represent "the value of damages avoided for a small emission reduction (i.e., the benefit of a $CO_2$ reductions)." The EPA has explained:

> The [social cost of carbon protocol] is meant to be a comprehensive estimate of climate change damages and includes changes in net agricultural productivity, human health, property damages from increased flood risk, and changes in energy system costs, such as reduced costs for heating and increased costs for air conditioning. However, given current modeling and data limitations, it does not include all important damages.[9]

80.    A federal Interagency Working Group ("Working Group"), consisting of multiple federal agencies, has prepared estimates of the cost that carbon pollution has on society. The Working Groups prepared its first Social Cost of Carbon" estimates in 2010, which was subsequently updated in 2013, 2015, and 2016.[10]

81.    The Working Group's Social Cost of Carbon estimates vary according to assumed discount rates and presumptions regarding the longevity and damages caused by carbon pollution

---

[8] EPA Fact Sheet, The Social Cost of Carbon (2016), https://www.epa.gov/sites/production/files/2016-12/documents/social_cost_of_carbon_fact_sheet.pdf.
[9] Id.
[10] Interagency Working Group, Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 at 3 (2016).

in the atmosphere, which for 2015 produced a range of between $11 and $105 per metric ton of carbon dioxide. Accepted practice typically applies the median value to determine the social costs of a given project, although the range of values provided by the Working Group is also useful for comparing alternatives and evaluating the significance of climate impacts from a program or project. For 2020, the median Social Cost of Carbon value is $42 per metric ton, which increases over time as additional carbon emissions become more costly to society. The Social Cost of Carbon is considered an extremely conservative value for a variety of reasons, including that it fails to account for numerous climate impacts.

82.    A number of the underlying Resource Managements Plans for the lease sales monetize the benefits of oil and gas development.

83.    BLM has used the Social Cost of Carbon to assess the impacts of its oil and gas lease sales in the past, but did not utilize this available tool to analyze the impacts of any of the challenged lease sales.

**B.    Carbon Budgeting**

84.    Carbon budgeting is another well-established method for estimating the impacts from GHG emissions. A "carbon budget" offers a cap on the remaining amount of GHG emissions that can be emitted while still keeping global average temperature rise below scientifically-based warming thresholds.

85.    The 2018 IPCC special report on *Global Warming of 1.5°C* provided a revised global carbon budget for a 66 percent probability of limiting warming to 1.5°C, estimated at 420 $GtCO_2$ and 570 $GtCO_2$ depending on the temperature dataset used, from January 2018 onwards. At the current emissions rate of 42 $GtCO_2$ per year, this carbon budget would be expended in just

10 to 14 years, underscoring the urgent need for transformative national and global action to transition from fossil fuel use to clean energy. *Id.*

86.    Using the IPCC's revised carbon budget, a 2019 Oil Change International Report found that "oil, gas, and coal in existing fields and mines would push the world far beyond 1.5°C while exhausting a 2°C budget as well."[11] Thus, there is no room for new fossil fuel development if we are to keep warming below 1.5 or even 2°C.[12]

87.    U.S federal fossil fuel resources (both leased and unleased) on public lands contain enough recoverable coal, oil and gas that, if extracted and burned, would result in as much as 492 GtCO$_2$, surpassing the entire *global* carbon budget for a 1.5°C target and nearly eclipsing the 2°C target.[13] Unleased federal fossil fuels comprise 91% of these potential emissions, with already leased federal fossil fuels accounting for as much as 43 GtCO$_2$, using up the most if not all of the remaining U.S. carbon budget.[14] In short, *any* new leasing of federal fossil fuel resources is inconsistent with a carbon budget that would seek to avoid catastrophic climate change.

88.    Instead of ratcheting down emissions, the United States is gearing up for a carbon burst fueled by expanding oil and gas production.[15] A 2019 Oil Change International Report found:

---

[11] Oil Change International, Drilling Toward Disaster 1, 11 (2019), http://priceofoil.org/2019/01/16/report-drilling-towards-disaster/.
[12] *Id.*
[13] EcoShift Consulting, The Potential Greenhouse Gas Emissions from U.S. Federal Fossil Fuels 1, 3 (2016).
[14] To conform to a 1.5°C target, the estimated U.S. carbon budget is 25 GtCO2eq to 57 GtCO2eq on average, depending on the sharing principles used to apportion the global budget across countries. Robiou du Pont, Yann et al., EQUITABLE MITIGATION TO ACHIEVE THE PARIS AGREEMENT GOALS, 7 NATURE CLIMATE CHANGE 38, Supplemental Tables 1 and 2 (2017).
[15] Oil Change International, Drilling Toward Disaster 1, 11 (2019), http://priceofoil.org/2019/01/16/report-drilling-towards-disaster/.

- Between now and 2030, the United States is on track to account for 60 percent of world growth in oil and gas production, expanding extraction at least four times more than any other country. This is the time period over which climate scientists say global carbon dioxide ($CO_2$) emissions should be roughly halved to stay in line with the 1.5°C target in the Paris Agreement.

- Between 2018 and 2050, the United States is set to unleash the world's largest burst of $CO_2$ emissions from new oil and gas development (Figure ES-2). U.S. drilling into new oil and gas reserves – primarily shale – could unlock 120 billion metric tons of $CO_2$ emissions, which is equivalent to the lifetime $CO_2$ emissions of nearly 1,000 coal-fired power plants.

- If not curtailed, U.S. oil and gas expansion will impede the rest of the world's ability to manage a climate-safe, equitable decline of oil and gas production. We find that, under an illustrative 1.5°C pathway for oil and gas taken from the Intergovernmental Panel on Climate Change (IPCC), U.S. production would exhaust nearly 50 percent of the world's total allowance for oil and gas by 2030 and exhaust more than 90 percent by 2050.[16]

89.    If BLM ceased new leasing and renewal of existing non-producing leases, total projected oil production would be reduced by 12% in 2025 and 65% by 2040, while natural gas production could be reduced by 6% in 2025 and 59% by 2040.[17]

90.    This avoided production would significantly reduce future U.S. emissions, and is desperately needed to avoid catastrophic climate change. Cessation of new and renewed leases for federal fossil fuel extraction could reduce annual $CO_2$ emissions by about 100 Mt by 2030.[18]

## III.    Greenhouse Gas Pollution from BLM's Oil and Gas Management Program

91.    BLM is responsible for the management of nearly 700 million acres of federal onshore subsurface minerals. As of 2018, BLM has leased 25.5 million acres of public lands for oil and gas, containing 38,147 individual oil and gas lease parcels and 96,000 active producible oil and gas wells.

---

[16] *Id.* at 6.
[17] P. Erickson & M. Lazarus, How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect $CO_2$ Emissions and 2 °C goals, Stockholm Institute, WP 2016-02 16 (2016).
[18] *Id.* at 26.

92.     NEPA's implementing regulations define a "program" as "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18. BLM's oil and gas leasing activities fall within this definition of a program because they are "connected agency decisions allocating agency resources to implement" the MLA for the purpose of exploration or development of oil and natural gas resources. *Id*.

93.     BLM expressly refers to its oil and gas leasing activities as a program. According to BLM's website, "BLM manages the Federal government's onshore oil and gas program with the goals of facilitating safe and responsible energy development while providing a fair return for the American taxpayer. For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States."

94.     All of the leasing authorizations challenged herein are part of BLM's comprehensive Oil and Gas Leasing Program to implement the Mineral Leasing Act.

95.     BLM's Oil and Gas Leasing Program contributes vast amounts of GHGs into the atmosphere, threatening the climate, the natural environment, and public health. In 2018, the U.S. Geological Survey released its first ever inventory of GHG emissions associated with federal coal and oil and gas production. The report revealed that on average between 2005 to 2014, fossil fuel production on federal public lands contributed 23.7 % of all U.S. carbon dioxide emissions or 1,279 million metric tons.[19] This is the equivalent of annual GHG emissions from

---

[19] M.D. Merrill et al., U.S. Geological Survey, Federal Lands Greenhouse Gas Emissions and Sequestration in the United States—Estimates for 2005–14 at 1, 7 (2018), https://pubs.er.usgs.gov/publication/sir20185131.

over 329 coal-fired power plants in one year. Taking into account releases of methane and other

GHGs, federal fossil fuel production generated nearly 25% of all U.S. GHG emissions over that

same time period. Emissions in 2014 from petroleum products and natural gas were estimated at

498.93 million metric tons of carbon dioxide equivalent ($CO_2$e), equaling the emissions from 128

coal-fired power plants.[20]

96.     In spite of the worsening climate crisis, Federal Defendants continue to authorize

the sale and issuance of hundreds of federal oil and gas leases on public lands across the

American West without meaningfully acknowledging or fully evaluating the climate change

implications of their actions.

**IV.    BLM's Oil and Gas Leasing Program and BLM's Individual Leasing Decisions Fail
to Consider Climate Change.**

97.     BLM made the leasing decisions challenged herein for five western states—

Colorado, Montana, New Mexico, Utah, and Wyoming—through separate administrative

processes for each lease sale. In general, the NEPA process for each sale included: a scoping

period, a comment period on the draft EA, and a protest period before the actual lease sale.

Plaintiff WildEarth Guardians fully participated during the administrative process for each of the

decisions challenged herein, raising the issues underlying the NEPA claims in this case.

98.     A list of the challenged site-specific leasing decisions is included in Table A at

the end of this Complaint. Deficiencies in BLM's NEPA analysis concerning the direct, indirect,

and cumulative GHG emissions resulting from each sale, and the impacts of these emissions on

climate change, are common amongst each of the challenged decisions.

99.     BLM has never analyzed the vast contribution of GHG emissions or climate

impacts of its Oil and Gas Leasing Program at the programmatic level. Likewise, BLM has not

---

[20] *Id.*

done so in the Resource Management Plans to which many of the challenged lease authorizations tier. This failure is carried forward to the agency's site-specific leasing decisions, including the decisions challenged herein, which fail to sufficiently quantify or analyze the direct, indirect, or cumulative impacts of foreseeable GHG emissions that will result from the BLM's leasing authorizations and the impact of these emissions on the environment, human health, and our climate.

### A.    Direct Impacts of Oil and Gas Leasing.

100.    Although some minor variation exists among the challenged leasing EAs, each challenged EA includes at least one of the following deficiencies in BLM's treatment of direct impacts of GHG emissions related to oil and gas development on the challenged leases: (1) BLM failed to fully quantify reasonably foreseeable GHG emissions from the lease sale by failing to estimate the total number of projected wells and then applying available per-well GHG emissions estimates to determine the total direct GHG emissions that could result from each lease sale over the lifespan of the proposed wells; and (2) BLM failed to consider the reasonably foreseeable effects of those GHG emissions on resource values in the relevant planning area.

101.    In each of the challenged leasing EAs, BLM does one or more of the following: (1) completely omits a direct GHG emission calculation from development of the lease sale parcels, (2) reports inapplicable field office wide GHG emission levels rather than disclosing GHG emissions from the smaller subset of proposed lease sale parcels as a whole, or (3) limits its discussion of direct GHG emissions to the annual $CO_2$ and methane emissions from a *single* well, even though each sale includes multiple individual lease parcels upon which multiple individual wells could be drilled. The 23 lease sales at issue in this case resulted in the sale of

2,067 parcels totaling more than two million acres of public lands, with the potential for development of many thousands of new wells.

102.    To excuse this failure, BLM generally asserts in its leasing EAs that it is not possible to estimate production-level GHG emissions or analyze the effects of these emissions until lessees submit parcel-specific development plans at the subsequent permitting stage. This is incorrect. Each BLM field office has available a reasonably foreseeable development scenario, which is produced at the resource management planning stage and projects oil and gas well development in each field office planning area. As the Tenth Circuit recently held, the number of wells projected to be drilled in a BLM field office's reasonably foreseeable development scenario are "reasonably foreseeable" and the impacts of such development must be assessed under NEPA. *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 854 (10th Cir. 2019). In addition, as the Court recognized in *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 68-69, BLM has "a mix of information" available to the agency at the leasing stage that allows BLM to "reasonably quantify" GHG emissions including raw data in leasing EAs that "allow[s] BLM to project the pace and scope of oil and gas development on the leased parcels," state GHG inventories, Resource Management Plan EISs, and various technical reports. In other words, the relevant and necessary data is available at the leasing stage to project well development from each lease parcel at the leasing sale stage. BLM has simply refused to apply existing information and disclose the resulting effects to the public.

103.    In its leasing EAs, BLM admits: "future development of these leases will result in emissions of . . . GHG pollutants." BLM also recognizes that "leasing is considered to be an irretrievable commitment of resources." Yet, after foregoing climate analysis at the programmatic level, BLM again postpones fully estimating and analyzing the scale of these

GHG emissions until the permitting stage when it receives an application to drill. Critically, at this final stage, BLM's authority is limited to imposing mitigation measures consistent with the terms of the lease, and can no longer prevent development altogether. Indeed, this Court recognized in *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 66, that "the leasing stage is the point of no return with respect to emissions." Thus, there is no doubt that BLM is required to estimate direct GHG emissions at the leasing stage.

        **B.**      **Indirect Impacts of Oil and Gas Leasing.**

104.    Although some minor variations between the challenged EAs exist, in general, BLM's indirect GHG emissions analyses in the leasing EAs suffer from two main deficiencies. First, a number of the EAs completely fail to analyze the reasonably foreseeable downstream climate impacts attributable to oil and gas combustion. For example, in one or more of the EAs, BLM admits that its EA does not account for the ultimate use or consumption of any produced minerals, stating "the total amount of production from the parcels to be leased cannot be estimated at this time." Second, a number of the EAs fail to estimate or explain why it could not estimate indirect emissions from development of the lease parcels as a whole. Instead, in many cases, BLM relied on broader, field office wide emissions estimates to assess indirect emissions.

105.    The Court in *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 73, held that "downstream GHG emissions from fossil fuel use are an indirect effect of BLM's oil and gas leasing program" and that "[d]ownstream use of oil and gas, and the resulting GHG emissions, are thus reasonably foreseeable effects of oil and gas leasing." As a result, "BLM was obligated to discuss downstream GHG emissions in its EAs" at issue in the litigation. *Id*. at 74. Although the Court did not require BLM to quantify downstream GHG combustion emissions in every instance, it did require BLM to "consider whether quantifying GHG emissions from

[combustion] is reasonably possible," and if BLM determined that it was not the agency was to "thoroughly explain" any decision that quantification of downstream GHG emissions is not "possible or helpful." *Id*. at 75. Because BLM did not do so in the EAs at issue in that case, the Court held that BLM had violated NEPA.

106.     Because downstream combustion impacts caused by the oil and gas extracted from the leases at issue in this case are reasonably foreseeable, NEPA requires BLM to analyze the full impacts of downstream GHG emissions resulting from its leasing decisions. BLM's failure to do so here in the EAs supporting the challenged leases violates NEPA.

### C.     Cumulative Impacts of Oil and Gas Leasing.

107.     The issuance of 2,067 leases resulting from the 23 lease authorizations challenged herein will result in new oil and gas development on almost 2 million acres of public lands across five states in the American West. BLM must consider the cumulative impacts of these new leases in the context of ongoing oil and gas production across our public lands as necessary to understand both the contribution of the GHG emissions from the challenged leasing decisions, as well as the contribution of GHG emissions from BLM's Oil and Gas Leasing Program to state, regional, and national GHG emissions and their associated effects.

108.     BLM data for fiscal year 2018 shows that 19.7 million acres—of the 25.5 million total acres—of public lands already leased for oil and gas development are in Colorado, Montana, New Mexico, Utah, and Wyoming. More than 11.2 million of these leased acres on public lands in Colorado, Montana, New Mexico, Utah, and Wyoming were actively producing oil and gas in fiscal year 2018.

109.     For each of the oil and gas leasing EAs, although BLM provides a generalized discussion of anticipated climate impacts within the region encompassing a given lease sale,

none of the leasing EAs fully estimated the contribution of GHG emissions from the lease authorizations in conjunction with GHG emissions from past, present, and reasonably foreseeable GHG-emitting oil and gas activities on public lands at a regional and national scale, including BLM lease sales occurring during the same time period in the region. Nor did BLM analyze the resulting climate impacts of cumulative GHG emissions from these activities in the leasing EAs.

110.    Instead, in a number of the leasing EAs, BLM declined to analyze cumulative impacts of GHG emissions at the leasing stage, reasoning that "since climate change and global warming are global phenomena, for the purposes of this NEPA analysis, the analysis presented about the direct and indirect effects of GHG emission from the proposed actions is also an analysis of the cumulative effects of the proposed actions," or that "[a]ttempting to analyze specific cumulative impacts of oil and gas operations without specific knowledge of the nature of the wells and appurtenances that might be proposed for a parcel would be too speculative to provide useful information to the decision-maker."

111.    In other leasing EAs, BLM only estimated cumulative emissions within the BLM field office where the lease sale parcels were located, and did not consider the contribution of GHG emissions from a particular field office in conjunction with GHG emissions from past, present, and reasonably foreseeable GHG-emitting oil and gas activities on public lands within the region or nation.

112.    In some of its leasing EAs, BLM continues to fail to quantify cumulative GHG emissions from the lease sale. In other EAs, BLM cites to state, national, and global emission levels to conclude emissions from a particular lease sale represent only a small fraction of these emissions, and are therefore insignificant. In so doing, however, BLM is defining the cumulative

impacts area with respect to GHG emissions at state, national, and global scales. Using this baseline, the appropriate scope of the agency's cumulative analysis must similarly be at these scales, which would include disclosing and considering the cumulative emissions from BLM's Oil and Gas Leasing Program—including emissions from all 96,000 active producible wells managed by BLM—and the contribution of a challenged lease sale to these emissions. BLM must not only disclose and quantify these emissions, but also consider the effect that these emissions will have on resource values and communities across the planning areas, and to our nation as a whole.

113.    In all of the leasing EAs, BLM fails to compare cumulative lease sale emissions to regional emissions, including reasonably foreseeable BLM lease sales in other states.

114.    In its leasing EAs, BLM emissions estimates from the proposed action, as then compared to state and national emissions, do not provide BLM or the public with a context for understanding the effects to climate from BLM's other leasing authorizations both individually and in the aggregate. Climate data and GHG quantification tools and methodologies, such as the social cost of carbon and/or carbon budgeting, are readily available to BLM, and are already in widespread use throughout the Federal and private sectors, state and local governments, and globally.

115.    In *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 79 n.80, the Court did not order BLM to use a particular methodology to assess the significance of cumulative emission levels from oil and gas development; however, as part of the remand of the unlawful leasing decisions the Court did order BLM to "reassess whether the social cost of carbon or another methodology for quantifying climate change may contribute to informed decisionmaking." The Court also made clear that "BLM may not forgo using the social cost of carbon simply because

courts have thus far been reluctant to mandate it" as a proxy for understanding the significance of emission impacts. *Id*. Because tools for analyzing climate impacts from various emission levels were available to BLM at the time of the leasing authorizations challenged herein, the agency was required to apply such measures, or explain in its Leasing EAs its decision to forgo use of any or all available tools. Failure to do so results in cumulative impact analyses in the Leasing EAs that are arbitrary and capricious.

116.    The social cost of carbon estimates the cost to society of each additional ton of GHG pollution emitted into the atmosphere, thereby providing a fairly comprehensive estimate of climate change damage resulting from a project's GHG emissions. The social cost of carbon methodology provides greater context for the significance of foreseeable leasing emissions, as compared to BLM's current practice, which simply compares lease sale emissions to nationwide and global emissions, and thus characterizes those emissions as de minimis.

117.    For example, as noted above, in 2018, the USGS estimated that oil and gas production on federal lands generated approximately 498.9 million metric tons of $CO_2e$ in 2014.[21] At the median social cost for 2020 of $42 per ton, in the aggregate BLM's Oil and Gas Program had a social cost of more than $20.95 billion. With the costs of carbon emissions rising every year, the future cost to society of BLM's Oil and Gas Program will be substantially higher if BLM continues its leasing activities unabated.

118.    Comparing a lease sale's total cumulative GHG emissions to the United States' remaining carbon budget can also provide a measurement by which to assess the significance of a lease sale's aggregate GHG emissions. Carbon budgeting allows for future emissions to be placed into context of the current global and national thresholds to limit GHG emissions and

---

[21] Merrill et al., *supra*, note 19, at 7 tbl. 1.

thereby avert catastrophic climate change. The application of carbon budgeting demonstrates that any new leasing of federal fossil fuel resources is inconsistent with emission limits that would avoid catastrophic climate change.

119.    None of the lease authorizations challenged herein applied the social cost of carbon protocol, carbon budgeting, or any other economic or scientific tools for understanding the context and intensity of the impacts of BLM's leasing decisions on climate. Yet in several EAs BLM provides extensive descriptions and numerical estimates of project benefits of its leasing decisions, stating that "Based on one hundred percent of the proposed parcels being sold, Valley County (Glasgow FO) would generate the greatest amount of Federal revenue with annual rent ranging from $7,821 for the first five years and $10,428 for the second five years." Although BLM does not include specific economic calculations in all of the leasing EAs, BLM's underlying RMPs generally do include such calculations in many cases, thereby resulting in the same misleading information being available to the public. Moreover, in every lease sale, BLM includes information on royalty rates, bonus bid rates, and rental rates. BLM's focus on the economic benefits of leasing coupled with the agency's refusal to address the climate costs of leasing and subsequent development undermines NEPA's purpose of informed decisionmaking "based on [an] understanding of environmental consequences." 40 C.F.R. § 1500.1(c). It also violates NEPA's mandate to "develop methods and procedures … which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(2)(B).

120.    BLM's failure to address the cumulative impacts of leasing and subsequent development undermines NEPA's purpose of informed decisionmaking "based on [an] understanding of environmental consequences." 40 C.F.R. § 1500.1(c).

## V.    Background for Specific BLM Leasing Decisions

### A.    <u>Colorado Lease Sales</u>

121.    BLM held oil and gas lease sales in Colorado on December 8, 2016; June 8, 2017; September 7, 2017; March 8, 2018; September 6, 2018; December 13, 2018; and March 29, 2019. Taken together, these BLM lease sales resulted in 126 parcels sold, totaling 82,976.55 acres of federal minerals across Colorado.

122.    Plaintiff WildEarth Guardians fully engaged in the public participation periods for each of these lease sales.

123.    Specifically, Plaintiff WildEarth Guardians:

- Protested BLM's December 8, 2016 lease sale on November 16, 2016; BLM denied this protest on December 7, 2016; BLM issued a FONSI and decision record approving the Royal Gorge Field Office parcels on December 7, 2016;

- Protested BLM's June 8, 2017 lease sale on April 10, 2017; BLM denied this protest on June 7, 2017; BLM issued a FONSI and decision record approving this lease sale on June 7, 2017;

- Protested BLM's September 7, 2017 lease sale on July 10, 2017; BLM denied this protest on September 7, 2017; BLM issued a FONSI and decision record approving the Royal Gorge Field Office parcels on September 5, 2017;

- Protested BLM's March 8, 2018 lease sale on January 9, 2018; BLM denied this protest on March 7, 2018; BLM issued a Determination of NEPA Adequacy for

this sale on March 6, 2018; BLM issued a decision record approving this sale on March 7, 2018;

- Protested BLM's September 6, 2018 lease sale on July 30, 2018; BLM denied this protest on September 5, 2018; BLM issued a FONSI and decision record approving the Royal Gorge Field Office parcels on September 5, 2018; BLM issued a Determination of NEPA Adequacy and decision record approving the Colorado River Valley parcels on September 5, 2018;

- Protested BLM's December 13, 2018 lease sale on November 15, 2018; BLM denied this protest on December 12, 2018; BLM issue a FONSI and decision record approving the Royal Gorge Field Office parcels on December 12, 2018; BLM issued two separate decision records approving the Colorado River Valley and Grand Junction and White River, Little Snake, and Kremmling Field Office parcels on December 12, 2018. BLM approved a Determination of NEPA Adequacy for the Colorado River Valley and Grand Junction parcels on December 11, 2018; BLM approved a Determination of NEPA Adequacy for the White River, Little Snake, and Kremmling Field Office parcels on December 14, 2018.

- Protested BLM's March 29, 2019 lease sale on February 22, 2019; BLM denied this protest on March 27, 2019; BLM issued a Determination of NEPA Adequacy and approved the decision record approving the White River and Kremmling parcels on March 21, 2019 and March 26, 2019 respectively; BLM issued a FONSI and decision record approving the Royal Gorge Field Office parcels on March 27, 2019.

B.      **Montana Lease Sales**

124.    BLM held oil and gas lease sales in Montana on December 8, 2016; June 13, 2017; December 11, 2018; and March 28, 2019. Taken together, these BLM lease sales resulted in 199 parcels sold, totaling 94,632.22 acres of federal minerals across Montana.

125.    Plaintiff WildEarth Guardians fully engaged in the public participation periods for each of these lease sales.

126.    Specifically, Plaintiff WildEarth Guardians:

- Protested BLM's December 8, 2016 lease sale on August 19, 2016; BLM denied this protest on October 7, 2016; BLM issued two FONSIs and decision records approving this lease sale on October 18, 2019;

- Protested BLM's June 13, 2017 lease sale on April 14, 2017; BLM denied this protest; BLM issued a FONSI and decision record approving this lease sale on June 12, 2017;

- Protested BLM's December 11, 2018 lease sale on November 1, 2018; BLM denied this protest on December 6, 2018; BLM issued a FONSI and decision record approving this lease sale on December 7, 2018; and

- Protested BLM's March 29, 2019 lease sale on February 28, 2019; BLM denied this protest on March 21, 2019; BLM issued a FONSI and decision record approving this lease sale on March 22, 2019.

C.      **New Mexico Lease Sales**

127.    BLM held oil and gas lease sales in New Mexico on September 1, 2016 and December 5, 2018. Taken together, these BLM lease sales resulted in 95 parcels sold, totaling 55,205.03 acres of federal minerals across New Mexico.

128.    Plaintiff WildEarth Guardians fully engaged in the public participation periods for each of these lease sales.

129.    Specifically, Plaintiff WildEarth Guardians:

- Protested BLM's September 1, 2016 lease sale on May 20, 2016; BLM denied this protest on April 26, 2017; BLM issued a FONSI and decision record approving this lease sale on April 27, 2017;

- Protested BLM's December 5, 2018 lease sale on October 31, 2018; BLM denied the protests on October 30, 2019; BLM issued a FONSI and decision record approving this lease sale on October 30, 2019.

**D.    Utah Lease Sales**

130.    BLM held an oil and gas lease sale in Utah on June 17, 2017. At this sale, BLM sold 8 parcels totaling 7,478.99 acres of federal minerals in central Utah.

131.    Plaintiff WildEarth Guardians submitted comments on the draft EA for the sale on February 11, 2017.

132.    Plaintiff WildEarth Guardians protested the June 2017 lease sale on April 10, 2017. BLM denied Guardians' protest on May 25, 2017; BLM issued a FONSI and decision record approving the lease sale on July 25, 2017.

**D.    Wyoming Lease Sales.**

133.    BLM held oil and gas lease sales in Wyoming on November 1, 2016, February 7, 2017, September 21, 2017, December 14, 2017, March 21–22, 2018, June 20–21, 2018, September 18–20, 2018, February 25, 2019, and March 19–20, 2019. Taken together, these BLM lease sales resulted in 1,639 parcels sold, totaling 1,659,752.79 acres of federal minerals across Wyoming.

134. Plaintiff WildEarth Guardians fully engaged in the public participation periods for each of these lease sales.

135. Specifically, Plaintiff WildEarth Guardians:

- Protested BLM's November 1, 2016 lease sale on September 2, 2016; BLM denied this protest on October 31, 2016; BLM issued a FONSI and decision record approving the lease sale that same day;

- Protested BLM's February 7, 2017 lease sale on December 9, 2016; BLM denied this protest on February 6, 2017; BLM issued two FONSIs and decision records approving the lease sale that same day;

- Protested BLM's September 21, 2017 lease sale on June 22, 2017; BLM denied this protest on September 20, 2017; BLM issued two FONSIs and decision records approving the lease sale that same day;

- Protested BLM's December 14, 2017 lease sale on September 7, 2017; BLM denied this protest on December 13, 2017; BLM issued a FONSI and decision record approving the lease sale that same day;

- Protested BLM's March 21–22, 2018 lease sale on December 15, 2017; BLM denied this protest on March 19, 2018; BLM issued two FONSIs and decision records approving the lease sale on March 20, 2018;

- Protested BLM's June 20–21, 2018 lease sale on May 10, 2018; BLM denied this protest on June 22, 2018; BLM issued a FONSI and decision record approving the lease sale on June 25, 2018;

- Protested BLM's September 18–20, 2018 lease sale on August 10, 2018; BLM denied this protest on September 18, 2018; BLM issued a FONSI and decision record approving the lease sale parcels on September 17, 2018;

- Protested BLM's February 25, 2019 lease sale on January 22, 2019; BLM denied this protest on February 22, 2019; BLM issued a FONSI and decision record approving the lease sale that same day; and

- Protested BLM's March 19–20, 2019 lease sale on February 26, 2019; BLM denied this protest on March 18, 2019; BLM issued a FONSI and decision record approving the lease sale that same day.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Failure to Take a Hard Look at the Severity of Direct, Indirect, and Cumulative Impacts of Greenhouse Gas Pollution**
**(Violation of NEPA)**

136.    Citizen Groups incorporate by reference all preceding paragraphs.

137.    Pursuant to NEPA and its implementing regulations, BLM must take a hard look at the direct, indirect, and cumulative environmental consequences of their proposed actions. 42 U.S.C. §§ 4332(2)(C)(i)-(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, and 1508.14.

138.    For all of the leasing authorizations identified in Table A, BLM failed to take the required hard look at the direct, indirect, and cumulative GHG emissions, and the resulting impacts of those emissions on climate change.

139.    For all of the leasing authorizations identified in Table A, BLM also failed to analyze these cumulative and similar actions together, even though the lease authorizations are similar in terms of their climate impacts, timing, and geography. 40 C.F.R. § 1508.25(a)(3).

140.    To comply with NEPA, BLM was required to take a hard look at the direct,
indirect, and cumulative GHG emissions and the severity of the impacts of those emissions on
climate change for the leasing authorizations identified in Table A. BLM has never taken a
comprehensive hard look at the climate impacts of its Oil and Gas Leasing Program at the
programmatic level, therefore BLM's leasing EAs cannot tier to a broader programmatic analysis
in lieu of doing a comprehensive analysis of climate impacts at the leasing stage. BLM is
required to provide a hard look analysis of these impacts before there are "any irreversible and
irretrievable commitments of resources which would be involved in the proposed action should it
be implemented." 42 U.S.C. § 4332(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

141.    BLM's assertion, in all of the leasing EAs, that it will estimate GHG emissions
and analyze the significance of those emissions at the subsequent drilling stage does not obviate
the obligation to consider the significance of those emissions at the *leasing* stage, the point at
which BLM makes an irretrievable commitment of federal resources. *WildEarth Guardians v.
Zinke*, 368 F. Supp. 3d at 66.

142.    Where information relevant to foreseeable adverse impacts is unavailable,
agencies must nonetheless evaluate "such impacts based upon theoretical approaches or research
methods generally accepted in the scientific community." 40 C.F.R. § 1502.22(b)(4). There are
several accepted approaches for evaluating the impacts of GHG emissions to climate and society,
including the Social Cost of Carbon and Carbon Budgeting frameworks.

143.    BLM failed to take a hard look at the direct, indirect, and cumulative impacts to
the climate from GHG emissions, and failed to discuss the severity of these impacts, when
authorizing thousands of new oil and gas leases through the challenged leasing decisions. More
broadly, BLM has demonstrated a systemic failure to account for these impacts in the agency's

Oil and Gas Leasing Program affecting federal lands across the American West. BLM's systemic and leasing decision specific failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA, 42 U.S.C.§ 4332(C)(ii), and its implementing regulations at 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27, and the APA at 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Failure to Prepare an EIS (Violation of NEPA)

144.    Citizen Groups incorporate by reference all preceding paragraphs.

145.    BLM's authorizations and issuance of the leases sold through the leasing authorizations challenged herein constitute major federal actions under NEPA.

146.    BLM does not have to prepare an EIS where it has demonstrated that the proposed action "will not have a significant effect on the human environment[.]" 40 C.F.R. § 1508.13. To assess whether or not an impact is significant, BLM must consider the "context and intensity" of the impact. 40 C.F.R. § 1508.27.

147.    BLM failed to evaluate the context and intensity of the environmental impacts resulting from its leasing authorizations challenged herein—in particular impact to climate change from GHG emissions—as required by NEPA. BLM also failed to provide convincing statements of reasons justifying its decisions to forgo an EIS analyzing the impacts of the leasing authorizations challenged herein, as required by NEPA.

148.    BLM's leasing authorizations will result in high levels of GHG emissions that could significantly impact climate. NEPA requires that BLM identify such impacts and assess their context and intensity to support its decisions to forego an EIS, which BLM failed to do.

149.    "[T]he appropriate time for preparing an EIS is prior to a decision, when the decisionmaker retains a maximum range of options." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 66 (citing *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D. C. Cir. 1983). "[T]he leasing stage is the "point of no return with respect to [GHG] emissions" because after the leasing stage BLM can only impose conditions that limit or mitigate GHG emissions; the agency cannot prohibit development of lease parcels once leases are issued. *Id.*

150.    BLM violated NEPA by failing to prepare an EIS before approving the leasing authorizations challenged herein. BLM's failure was arbitrary, capricious, an abuse of discretion, in excess of statutory authority and limitations, short of statutory right, and not in accordance with the law and procedures required by law. 5 U.S.C. §§ 706(2)(A), (C), (D).

## RELIEF REQUESTED

WHEREFORE, Citizen Groups respectfully request that this Court:

A.    Declare that Federal Defendants' leasing authorizations challenged herein are arbitrary and violate NEPA and its implementing regulations;

B.    Vacate Federal Defendants' leasing authorizations and accompanying EAs and FONSIs challenged herein;

C.    Set aside and vacate all of the leases issued pursuant to the leasing authorizations challenged herein;

D.    Enjoin Federal Defendants from approving or otherwise taking action on any applications for permits to drill on the oil and gas leases challenged herein until Federal Defendants have fully complied with NEPA and its implementing regulations;

E.    Order Federal Defendants to prepare an EIS analyzing the direct, indirect, and cumulative effects of the leasing authorizations challenged herein, including the incremental

impact of the challenged leases, together with the other past, present, and foreseeable cumulative impacts from BLM's Oil and Gas Leasing Program;

F.      Retain continuing jurisdiction of this matter until Federal Defendants fully remedy the violations of law complained of herein, in particular to ensure Federal Defendants take a meaningful hard look at the direct, indirect, and cumulative impacts of GHG emissions from BLM's Oil and Gas Leasing Program to climate;

G.      Award the Citizen Groups their attorneys' fees, costs, and other expenses incurred in pursuing this action as provided by applicable law; and

H.      Issue such relief other relief as this Court may deem just, proper, and equitable.


Respectfully submitted this 9th day of January, 2020.

_/s/ Samantha Ruscavage-Barz_
Samantha Ruscavage-Barz
Bar No. CO0053
301 N. Guadalupe Street, Suite 201
Santa Fe, NM 87501
(505) 410-4180
sruscavagebarz@wildearthguardians.org

Shiloh S. Hernandez
MT Bar No. 9970
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 204-4861
hernandez@westernlaw.org
(_Pro Hac Vice application forthcoming_)


Daniel L. Timmons
NM Bar No. 152754
WildEarth Guardians
301 N. Guadalupe Street, Suite 201
Santa Fe, NM 87501
(505) 570-7014
dtimmons@wildearthguardians.org
(_Pro Hac Vice application forthcoming_)

Kyle Tisdel
CO Bar No. 42098
Western Environmental Law Center
208 Paseo del Pueblo Sur, Suite 602
Taos, NM 87571
(575) 613-8050
tisdel@westernlaw.org
(_Pro Hac Vice application forthcoming_)


_Attorneys for Plaintiffs_

**TABLE A**

| State | Date of Sale | Field Office(s) | Acreage Sold | Parcels Sold |
|---|---|---|---|---|
| Colorado | December 8, 2016 | Royal Gorge | 841.93 | 4 |
| | June 8, 2017 | Kremmling, Little Snake, White River | 63,268.12 | 70 |
| | September 7, 2017 | Royal Gorge | 403.81 | 3 |
| | March 8, 2018 | Colorado River Valley, Grand Junction | 1,400.31 | 4 |
| | September 6, 2018 | Colorado River Valley, Royal Gorge | 8,159.98 | 20 |
| | December 13, 2018 | Kremmling, Little Snake, Royal Gorge, White River | 7,847.25 | 20 |
| | March 28, 2019 | Kremmling, Royal Gorge, White River | 1,055.15 | 5 |
| Montana | December 8, 2016 | HiLine, Miles City | 7,179.09 | 33 |
| | June 13, 2017 | Miles City | 15,611.47 | 49 |
| | December 11, 2018 | Miles City | 9,900.54 | 21 |
| | March 27, 2019 | Billings, Glasgow, Havre, Miles City | 61,941.12 | 96 |
| New Mexico | September 1, 2016 | Carlsbad | 13,876.08 | 36 |
| | December 5, 2018 | Carlsbad | 41,328.95 | 59 |
| Utah | June 17, 2017 | Richfield | 7,478.99 | 8 |
| Wyoming | November 1, 2016 | High Desert | 32,422.02 | 21 |
| | February 7, 2017 | High Plains, Wind River-Bighorn Basin | 183,155.02 | 278 |
| | September 21, 2017 | High Plains, Wind River-Bighorn Basin | 106,687.00 | 127 |
| | December 14, 2017 | High Desert | 68,818.92 | 41 |
| | March 21-22, 2018 | High Plains, Wind River-Bighorn Basin | 151,638.20 | 152 |
| | June 20-21, 2018 | High Desert | 192,860.40 | 158 |
| | September 18-20, 2018 | High Plains, Wind River-Bighorn Basin | 301,605.31 | 311 |
| | February 25, 2019 | High Desert, High Plains, Wind River-Bighorn Basin | 526,697.36 | 437 |
| | March 19-20, 2019 | High Desert, High Plains, Wind River-Bighorn Basin | 95,868.56 | 114 |
| **TOTAL** | **23** | | **1,900,045.58** | **2067** |